UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER LUKE PRATT, #673261,

                      Petitioner,

v.                                 CASE NO. 2:10-CV-10641
                                 HONORABLE GEORGE CARAM STEEH

NICK LUDWICK,

                      Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED ON APPEAL IN FORMA PAUPERIS

**I.**    **Introduction**

Michigan prisoner Christopher Luke Pratt ("Petitioner") has filed a petition for a writ of habeas corpus with this Court pursuant to 28 U.S.C. § 2254 asserting that he is being held in violation of his constitutional rights. Petitioner was convicted of assault with a dangerous weapon, MICH. COMP. LAWS § 750.82, interfering with electronic communications causing injury, MICH. COMP. LAWS § 750.540(5)(b), domestic assault and battery, MICH. COMP. LAWS § 750.81(2), and unlawful imprisonment, MICH. COMP. LAWS § 750.349b, following a jury trial in the Calhoun County Circuit Court in 2007. He was sentenced to concurrent terms of 15 to 48 months in prison on the assault and interference convictions, 93 days in jail on the domestic violence conviction, and 56 to 180 months in prison on the unlawful imprisonment conviction in 2008.

In his pleadings, Petitioner raises claims concerning the admission of other acts evidence, the failure to disqualify a juror, the denial of motions for mistrial, judgment notwithstanding the verdict, and new trial, and the scoring of the sentencing guidelines. Respondent has filed an answer

to the petition contending that it should be denied.  For the reasons set forth, the Court finds that Petitioner is not entitled to habeas relief on his claims and denies the petition.  The Court also denies a certificate of appealability and denies leave to proceed *in forma pauperis* on appeal.

## II.    Facts and Procedural History

Petitioner's convictions arise from an assault on his girlfriend, Norrene Parker, at their home in Calhoun County, Michigan on June 24, 2007.  The prosecution presented several witnesses at trial.  Norrene Parker testified that she was in a relationship with Petitioner for 1½ years before trial. They met in March, 2006 through their sons, Dillon and Luke, and began dating.  About a week after their first date, she found Petitioner urinating on her fence and he told her that he was "marking his territory."  She began living with Petitioner in June, 2006.  Petitioner told her that there was not enough room for her belongings in the house, so her things were put in storage.  Petitioner, however, had a "game room" where he kept his hunting gear, guns, and personal items. He did not want anyone in there, got upset if people went in the room, and told people, "Just remember I don't miss when I shoot."  Parker testified that she had two cats when she moved in, but Petitioner did not like cats. One cat died within a week of the move from antifreeze poisoning and Petitioner told her that he took the second cat to his uncle's barn, although she never saw the cat when they visited.

Parker testified that Petitioner would sometimes get mad and not speak to her or the children for days at a time.  Near the end of July, 2006, Petitioner and his ex-wife were involved in a custody dispute.  When Petitioner came home one day, Parker greeted him and hugged him. He responded by saying that he was "not into hugs" anymore and laying down on the couch. He remained on the couch for about a week, taking a leave of absence from work.  Parker was home at the same time battling Crohn's disease. Although she was sick, she waited on Petitioner, including sponge-bathing

-2-

him, as he lay on the couch.  Petitioner told her that he took medication for panic attacks and said

that he never knew when he was "going to go off."

Parker testified that Petitioner first became physically aggressive with her on Memorial Day,

2007.  He had been out all night and did not answer her calls, so she called his brother's house

looking for him.  The next morning, Parker looked in Petitioner's toiletry bag and it had Viagra pills

in it.  Parker asked Petitioner about them.  He said that he would only take Viagra if he had a room

for the night with a hot chick, but then denied having the pills or that they were his.  The two argued.

As she was leaving the house with the boys, Petitioner called her a "fucking bitch" and pushed her

out the back door. She stumbled.  As she tried to right herself, Petitioner slammed her arm into the

door and continued to slam the door.

Parker claimed that Petitioner acted differently when others were around.  He would scream

at her and her kids on the way to someone's house and then tell them to act like everything was

okay.  Not knowing how Petitioner would be put Parker on edge.  After an explosive episode,

Petitioner would apologize, tell Parker he loved her, and say that he could not live without her.

Parker accepted the apologies, hoping it would get better, but they argued a lot.  At one point, Parker

told Petitioner that he should go stay with his mother for a while until they could work things out.

Petitioner told Parker it was not in her best interest to leave him.  He also told her that they would

always be together and that if she left him, he would come find her.  On another occasion, Petitioner

told Parker that they could not be friends if they were not together because he would hate her as

much as he loved her, and that could be bad for her.

Another physical incident occurred in June, 2006 when Parker received court papers.

Petitioner did not want Parker to go to court so they argued.  Parker was on the front porch when

Petitioner came home and walked up behind her.  He asked her to perform oral sex on him right there on the porch.  Parker refused and turned to walk into the house.  Petitioner pushed her into the door. Parker told him not to push her.  Petitioner shoved her.  She went into the dining room.  Her son Dillon was in the living room at the time.

Parker also testified about a phone call that occurred the weekend before Thanksgiving. Parker was home cooking when Petitioner came home from work, saying he was working overtime. The phone rang about 10 minutes later.  Petitioner answered it, grinning, and told the caller that he did not know who it was and it must be a wrong number.  Parker then took the phone and thought the female caller was Petitioner's sister-in-law.  She gave the phone to Petitioner who smirked and said that he did not know the caller.

Parker also testified about an incident that occurred at their home during Easter, 2007. Parker's friend Theresa was in town visiting her grandmother.  Parker and her children went there for about 1½ hours during the afternoon to visit.  When they got home, Parker told Petitioner where she had been and he asked her about their conversations.  They got into an argument and Petitioner threw a cell phone at an upstairs wall, embedding key-prints on the wall.

Just prior to Father's Day in June, 2007, Parker received a subpoena from the prosecutor's office.  Petitioner told her:  "Go ahead and talk. I'll find out what you said and I'll cut your tongue out of your face."  A short time later, Trooper Anne Pohlman visited Parker at her home. Petitioner called Parker three times while the trooper was there, asking why she was there.  During the summer of 2007, Parker went to Bailey Park where her son played soccer.  Petitioner said he wanted to talk to Parker.  She wanted to talk there, but he said no they were going for a ride.  Parker tried to get the keys out of the ignition.  Petitioner elbowed her in the chest and threw her back into the seat.  He

swore at her and sped through town for 20 minutes or more until they were just a few miles from home.  Parker tried to calm Petitioner down.  He eventually turned around, apologized, and went back to the game like nothing happened.

Petitioner normally texted Parker 15 to 20 times a day.  He also forced Parker to have sex after she told him no.  On one occasion, when Parker was making breakfast the following morning, Petitioner came up behind her, thanked her, and said, "You acted like you didn't want to but I just thought you were playing hard to get and took it anyway."  Parker also testified that Petitioner would often grab her by the arms and say, "just listen to me."  She would try to walk around him and he would shake her.  When Petitioner was in one of his "quiet moods," he would bump into her really hard.  Sometimes when they were arguing and she tried to leave the room, he would pick her up in a bear hug so her feet could not touch the ground. Petitioner also head-butted her on several occasions and once bit her nose while pretending to give her a kiss.

Parker said that her relationship with Petitioner was fraught with problems even before June, 2007.  He would not talk to her for weeks and then act as if nothing was wrong.  Petitioner was unemployed for certain periods.  She did not leave him because she was afraid.  Once when she said she was going to leave and began walking away, Petitioner laughed and said:  "You see how far you can get to that car before your spine is all over that backyard."  Another time, Petitioner sat next to her as she was paying bills, and asked her if she had ever been "zip stripped and left in the woods."

Parker testified in detail about the incident on June 24, 2007.  An uncle visiting from Texas for a family reunion called her that morning wanting to see her and her sons again before he left town.  The call woke her up and she went downstairs to answer the phone.  Petitioner sat behind her

while she was on the phone.  Parker was excited to see her family and went into the bathroom to take a shower.  Petitioner left while she was in the shower and returned home around noon.

Parker and the boys were getting ready to leave when Petitioner returned home.  She was going to the store to have photos from a family reunion developed to take to her uncle.  On her way to the store, Petitioner called her cell phone.  Parker did not answer while she was in the car.  She also received two text messages from Petitioner.  When she was in the store, her phone rang again and she answered it.  Petitioner said, "Why would you dial the home phone number before you leave, you crazy bitch."  Parker did not know what he was talking about.  She told Petitioner she was on her way home, everything was okay, just relax.  Petitioner was upset and yelling.  After getting her photos, Parker and the boys went to another store for about 20 minutes and then returned home.

When Parker entered the house, Petitioner was sitting on the couch and talking on the phone.  After he ended his conversation, Parker reached for the phone to put it back in the charger, since it was beeping like it needed to be re-charged.  Petitioner grabbed her hand and asked why she needed the phone.  She told him it needed charging.  As she walked to put the phone away, Petitioner told her to give it back.  Parker walked outside into the yard with the phone, and Petitioner followed her.  Her older son Dillon was mowing the lawn on the side of the house and her younger son Tristand was riding his bike.  Petitioner kept telling her to give him the phone.  He asked what was wrong with her, said he was not going to hurt her, and laughed.  Parker walked around the house and then tried to get in the porch door, but it was locked.  She then walked back the way she came to get into the house.  She was about one step into the dining room when Petitioner grabbed her and said, "give me the damn phone."  She jerked away and walked alongside the dining room table.  Petitioner

followed her, yelling at her to give him the phone.  She told him she was just going to put it back, and he told her she did not need to know who he was talking to.

Parker put the phone back in the living room and sat down on the love seat.  Petitioner sat down on the couch and started arguing with her, asking her why she called the home phone.  Parker got up to leave. Petitioner grabbed her in a bear hug and started squeezing her.  He squeezed her so hard her ring cut her finger. He then picked her up off the ground as he squeezed her and spun her around.  He sat down on the love seat and pulled her down on top of him.  Parker screamed, cried and told him to let her go, "I can't do this anymore. . . . I'm done."  Petitioner put her down and started pacing.  He then grabbed the phone from the cradle, slammed it on the ground and screamed, "there, you'll never fucking know who I was talking to you dumb bitch."  Parker stood up and the next thing she knew, an oak chair flew by her arm.  Petitioner threw more furniture at her while she tried to get out through the back door.  Petitioner told her that she could not leave him and they would always be together, then he called her a slut and said just leave.

As Parker tried to get out the back door, Petitioner grabbed the baker's rack, pulling it down so that its contents flew at Parker.  Petitioner went into the kitchen, grabbed food that was on the counter, and threw it.  He also picked up a chair, told Parker he hated her, and threw the chair at her, hitting her in the ankles and shins.  Petitioner then went to his game room.  Parker ran into the kitchen, picked up a landline phone, and tried to call for help.  The phone jack was in the dining room.  Parker had the phone in her hand when Petitioner came "barreling" out of the game room and yanked the cords out of the wall.  He asked what she was doing, but she just stood there.  She told him that he needed to leave.  He told her to leave.  He then looked around and said, "Now look

what you've done. Look at the mess you've made." He got close to Parker's face and told her that he had been cheating on her the whole time "you dumb bitch."

Parker remained in the kitchen as Petitioner walked toward his game room. Parker heard him pacing. She tried to run out of the house, but he stopped her at the back door. Petitioner laughed and "growled" and told her she was not leaving. She tried to go out the door, but Petitioner grabbed her arm and yanked her keys out of her hand. Tristand came by on his bike. Petitioner took her keys and threw them over Tristand's head. She wanted to leave, but could not get by Petitioner. She told Petitioner she wanted to leave, but he would not let her pass. Parker told Tristand to go and call the police, but Petitioner told him not to do so. Tristand went to Rolland Face's house. Parker spoke to Petitioner's ex-wife after he was arrested, but did not discuss her testimony.

Two of Parker's children, 11-year-old Tristand Parker and 14-year-old Dillon Holtz, testified about their recollections of June 24, 2007. Tristand testified that he ran errands with his mother and siblings that morning. After they returned home, their dog got loose, so he rode his bike down the street trying to find him. When he came home and pulled into the driveway, he heard yelling. He looked into the kitchen window and saw Petitioner hold a chair above his head and throw it. Tristand rode his bike to the back of the house. He then heard Petitioner yelling, saw him in the doorway grabbing his mother's hand, and saw him throw keys outside toward the barn. His mother was screaming and told Tristand to call the police. Tristand rode his bike to his neighbor Rolland Face's house and asked him to call the police. Tristand saw Petitioner drive away in his truck. While Tristand was outside, his mom drove up in her car, told him to get in, and they returned to Face's house until the police arrived. Dillon testified that he went shopping with his mother and siblings that day. Upon their return home, he went outside to mow the lawn. At one point, he heard

-8-

his mom scream and shut off the mower.  He saw Petitioner dart out of the house and heard him say, "I fucking hate you bitch.  I hope you fucking die."  Petitioner then drove off in his truck.

Michigan State Police Trooper Richard Pazder testified he responded to the police call.  He spoke with Norrene Parker, her sons, and Rolland Face for about an hour.  Parker was upset and crying.  Her hand was bleeding, she had red marks on her arm and shin, her shin was swelling, and she was limping.  Trooper Pazder also spoke with Petitioner's sons briefly and spoke to Petitioner on one of the son's cell phones.  He declined to return to the scene for questioning, but later attempted to contact Trooper Pazder.  Trooper Pazder next spoke to Petitioner at the Calhoun County Jail after advising him of his rights.  Petitioner told him that Norrene Parker became upset on the day of the incident because she thought Petitioner was talking to another woman on the phone.  Petitioner said that they argued, called each other names, and broke things in the home.  Petitioner admitted that he became angry and started to throw and break things.  He specifically mentioned that he threw a chair and a phone and knocked the microwave off of the kitchen counter.  Petitioner  claimed that Parker had hit him in the chest and kicked him, but said that he did not have any marks from it.  Petitioner said that when Parker told her son to call the police, he knew that the house was destroyed and he would be arrested, so he left.  Petitioner said that he would never do anything to hurt Parker.  Trooper Pazder also conducted a follow-up interview with Parker.  He observed multiple bruises on her right leg.  During the course of the investigation, Trooper Pazder and another trooper spoke with several other people, took photographs of the scene which showed significant property damage and scattered debris, and secured three shotguns, three knives, and a bag of zip ties from the home.

Dr. Mark Machalka, a family physician at Marshall Medical Associates, testified that he treated Norrene Parker on several occasions.  On February 5, 2007, Parker seemed tearful and depressed and reported that Petitioner was very controlling and would not let her do things on her own.  She also said that he may have been with another woman and she was worried about sexually-transmitted diseases.  On April 23, 2007, Parker reported that she had experienced fatigue, weakness, anxiety, depression, and trouble sleeping.  She has been treated at a hospital, but Dr. Machalka did not have those records at the time of her visit.  Parker also told him that she was scared because one of Petitioner's sons said that he had harmed his ex-wife.  On April 30, 2007, Parker again complained of fatigue, weakness, and depression.  She reported having trust issues and arguments with Petitioner.  Parker indicated that she had been hospitalized for her symptoms but no cause had been determined.  Dr. Machalka testified that the hospital records were in his office, but he did not have them with him.  It was Dr. Machalka's opinion that Parker was depressed.  He recommended medications and counseling.  He discussed some of her medications, but did not have the list with him.  Dr. Machalka also saw Parker on May 15, 2007 and July 3, 2007, and her condition was the same.  He did not treat her for physical injuries on those occasions.

Susan Harrington, Petitioner's ex-wife, testified about their relationship and marriage.  She recounted incidents of verbal and physical abuse that took place weekly.  She described incidents when Petitioner shook her, pushed her, threw things at her, and called her a "fucking bitch" and a "fucking whore."  She specifically recalled an incident when Petitioner pushed her, chased her, and choked her while she was pregnant with their younger son.  She recalled an incident when Petitioner grabbed her by the throat, pushed her into the bathroom, and slammed her head into the toilet.  She testified about two incidents when Petitioner pushed her head into her car window and into her car

steering wheel.  She described a fight where Petitioner threw a scrap bucket at her, blocked her from using the telephone, chased her as she ran outside, grabbed her, and broke her arm.  Harrington testified that she finally pressed charges against Petitioner and left him after an incident in which he threw a Christmas tree and mugs at her.  Petitioner made threatening telephone calls and stalked her afterward, but they did not have further physical confrontations.  They continued to have ongoing child custody issues for several years after their divorce.  Harrington also testified that she went to Petitioner's house during the afternoon on June 24, 2007 to drop off her son.  She drove back to the house to pick her son up after he called her later that day.  She spoke with Norrene Parker for a few minutes.  Her sons only returned to Petitioner's house once after that day to retrieve their belongings.

When the prosecution rested, defense counsel moved for a directed verdict as to the charges of interference with electronic communications causing injury and unlawful imprisonment, which the trial court denied.  Defense counsel also moved for a mistrial because Dr. Machalka referred to records not admitted into evidence and because only 13 of 14 jurors were present that day.  The trial court found that Dr. Machalka's testimony was proper, informed the parties that the missing juror had been excused due to illness, and denied the motion.

Petitioner presented several defense witnesses.  His older son, Luke Pratt, testified that he rode his moped to Petitioner's house on June 24, 2007.  He went inside, saw the mess, spoke to Trooper Pazder for a few minutes, and returned to his mother's house.  He recalled telling Trooper Pazder that his father had thrown things before, but not a lot and he could not recall what he said about his father's temper.  Petitioner's younger son, Josh Pratt, testified that his mother dropped him

-11-

off at his father's house on June 24, 2007.  No one was there, but Trooper Pazder came by and spoke to him.  He then called his mother to pick him up and went home.

Patricia Heidrich, a daycare provider, testified that she was familiar with Norrene Parker's reputation in the community and believed that she was not credible.  Heidrich admitted that Parker had previously testified against her at a daycare violations proceeding.

Petitioner testified in his own defense at trial.  He said that he was married to Susan Harrington for nine years and they had two children, who were the subject of ongoing custody disputes as late as 2007.  Petitioner testified that the name-calling in his marriage was mutual and that there were good and bad times in the marriage.  Petitioner attributed some of their marital problems on Harrington's medical issues after their second son was born.  Petitioner denied engaging in physical abuse and claimed that the events Harrington discussed never happened.

Petitioner said that he loved Norrene Parker more than anyone in his life.   He discussed Parker's medical condition and indicated that it caused her stress.  As to the June 24, 2007 incident, Petitioner testified that he and Parker fought that morning; and she later threatened to throw his stuff out of the house because he was cheating on her.  He claimed that when Parker arrived home after running errands, she accused him of talking to another woman on the phone.  An argument ensued, resulting in property destruction with the first being caused by Parker throwing the cordless phone. Petitioner said after she threw the phone, he handed it back to her, though it was broke with the battery hanging out of it.  Petitioner said that as he walked out of the room, he "flipped" two chairs down.  He also said that he grabbed a corner of the baker's rack and pulled on it as he walked by. It then collapsed, so he slung it behind him, which "just made a heck of a mess, all over."  He then went into the kitchen where he pushed the other phone and the microwave off at the same time.

-12-

Petitioner claimed that Parker was mad about him cheating on her and that there was no talk of calling 911. He also said that he was upset about her accusing him of cheating, which he said he would never do. He also testified that he gave Parker a bear hug to console her, and she must have hurt herself during this time when she was flailing about high up off the ground. Petitioner testified that he wanted Parker to leave the house and denied trying to prevent her from doing so.

Following deliberations, the jury found Petitioner guilty of the charged offenses. Petitioner filed a motion for judgment notwithstanding the verdict and/or new trial with the trial court asserting that the verdict was against the great weight of the evidence as to his convictions for interference with electronic communications causing injury and unlawful imprisonment. The trial court conducted a hearing and denied the motion. The trial court then sentenced Petitioner to the terms of imprisonment previously set forth.

Petitioner filed an appeal of right with the Michigan Court of Appeals, raising several claims of error. The Michigan Court of Appeals denied relief on those claims and affirmed his convictions and sentences. *People v. Pratt*, No. 284299, 2009 WL 1652831 (Mich. Ct. App. June 11, 2009) (unpublished). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. Pratt*, 485 Mich. 996, 775 N.W.2d 144 (2009).

Petitioner thereafter filed his federal habeas petition, raising the following claims:

I.     The trial court erred by admitting prior bad acts evidence.

II.    The trial court committed reversible error by not disqualifying a juror.

III.   The trial court committed reversible error by denying a mistrial.

IV.    The trial court erred by denying his motions for judgment notwithstanding the verdict and new trial.

V.     The trial court erred in the scoring of certain sentencing variables.

-13-

Respondent has filed an answer to the petition contending that it should be denied because the claims are not cognizable, lack merit, and/or are barred by procedural default.

## III.   __Standard of Review__

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this case because Petitioner filed his petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

A state court's decision is contrary to clearly established law if it "'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*,

-14-

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, _ U.S. _, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The Supreme Court has held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, _ U.S. _, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme

Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 131 S. Ct. at 785. Furthermore, it "does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue. *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, _ U.S. _, 131 S. Ct. 1388, 1398 (2011).

-16-

IV.    **Discussion**

   A.    **Other Acts Evidence Claim**

Petitioner first asserts that he is entitled to habeas relief because the trial court erred in admitting other acts evidence involving the victim, Norrene Parker, and erred in admitting other acts evidence involving his ex-wife, Susan Harrington.  Respondent contends that this claim is not cognizable upon habeas review and lacks merit.

The Michigan Court of Appeals denied relief on this claim, finding that the other acts evidence was properly admitted under state law.  *See Pratt*, 2009 WL 1652831 at *1-2.  The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof.  Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). "Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action, unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment."  *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *McGuire*, 502 U.S. at 69–70); *see Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citing *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Accordingly, to the extent that Petitioner asserts that the trial court erred in admitting the testimony under Michigan law, he merely alleges a state law violation which does not entitle him to federal habeas relief.  *See, e.g., Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007); *Wheeler v.*

*Jones*, 59 F. App'x 23, 28 (6th Cir. 2003). State courts are the final arbiters of state law and the federal courts will not intervene in such matters. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002).

Additionally, as to the admission of other acts, the United States Supreme Court has declined to hold that similar "other acts" evidence is so extremely unfair that its admission violates fundamental conceptions of justice. *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990).[1] Thus, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d 496, 512 (6th Cir. 2003). Consequently, there is no Supreme Court precedent that the state court decisions could be deemed "contrary to" under 28 U.S.C. § 2254(d)(1). *Id.* at 513; *see also Adams v. Smith*, 280 F. Supp. 2d 704, 716 (E.D. Mich. 2003). Petitioner has thus failed to state a claim upon which habeas relief may be granted as to this issue.

Furthermore, even if Petitioner states a cognizable claim, he is not entitled to relief. Petitioner has not shown that the admission of the other acts evidence rendered his trial fundamentally unfair. The other acts evidence was relevant and admissible as evidence of other domestic assaults under MICH. COMP. LAWS § 768.27b and on the issues of motive, state of mind, plan, and intent under MICH. R. EVID. 404(b). The trial court also instructed the jury on the proper consideration of such evidence. Jurors are presumed to follow a trial court's instructions. *See Penry*

---

[1]While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.

*v. Johnson*, 532 U.S. 782, 799 (2001) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987));

*United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors . . . take an oath to follow the law as

charged, and they are expected to follow it."). Petitioner has failed to establish that the admission

of the other acts evidence was erroneous or, more importantly, that it rendered his trial

fundamentally unfair. Habeas relief is not warranted on this claim.

### B.  Non-Disqualification of Juror Claim

Petitioner next asserts that he is entitled to habeas relief because the trial court failed to

disqualify a juror (Juror Wicklund) for cause due to his knowledge about the case, as well as another

investigation involving a missing woman and Petitioner, and his discussions with his wife, a city

attorney. Respondent contends that this claim lacks merit.

It is well-settled that the Sixth Amendment right to a jury trial guarantees a criminal

defendant a fair trial by a panel of impartial jurors. *Smith v. Phillips*, 455 U.S. 209, 217 (1982);

*Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Qualified jurors need not be totally ignorant of the facts

and issues involved. *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975); *Miller v. Webb*, 385 F.3d

666, 673 (6th Cir. 2004). When faced with an allegation of juror bias, the question is whether the

prospective juror swore "that he could set aside any opinion he might hold and decide the case on

the evidence, and should the juror's protestation of impartiality have been believed." *Patton v.

Yount*, 467 U.S. 1025, 1036 (1984); *Holder v. Palmer*, 588 F.3d 328, 344 (6th Cir. 2009). The

determination of juror bias in a state criminal trial is one of historical fact. *Patton*, 467 U.S. at 1036.

Consequently, a state trial court's decision as to a juror's impartiality is a factual determination

entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Williams v. Bagley*, 380

F.3d 932, 953 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 519 (6th Cir. 2003)). A state

trial court's decision on whether to excuse a prospective juror for cause is entitled to deference on habeas review because of the trial judge's proximity to the venire and the determination of credibility and demeanor that is involved in jury voir dire. *Id.*

The Michigan Court of Appeals denied relief on this claim, finding that the trial court did not abuse its discretion in denying Petitioner's challenge for cause. The court explained in part:

> After reviewing the in-camera questioning of the juror, we conclude that the trial court did not abuse its discretion in refusing to dismiss the juror for cause. The juror was questioned extensively regarding the fact that he read some articles about defendant's involvement in this case and the unrelated case of Mary Lands, and had discussed the Lands case with his wife. However, the juror indicated that the discussions were matters of opinion only, not fact, and his wife never expressed an opinion as to defendant's culpability. The juror repeatedly indicated that he did not associate the Lands case with the case at bar and that he believed he could be a fair and impartial juror. He agreed that he would follow the law as given by the trial court and restrict his consideration only to the evidence presented at trial, and exclude preconceived opinions, conversations with anyone, and any articles he read. "Juror exposure to information about a defendant's previous convictions or newspaper accounts of the crime for which he has been charged does not in itself establish a presumption that a defendant has been deprived of a fair trial by virtue of pretrial publicity." *Jendrzejewski, supra* at 502, 566 N.W.2d 530. Where the juror indicates that he can set aside a prior opinion and be fair and impartial, he may remain on the jury. *Id.* at 515–516, 566 N.W.2d 530. In addition, "[a] juror who expresses an opinion referring to some circumstance of the case which is not positive in character, but swears he can render an impartial verdict, may not be challenged for cause." *People v. Roupe*, 150 Mich. App. 469, 474, 389 N.W.2d 449 (1986).

*Pratt*, 2009 WL 1652831 at *3.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The record reveals that the trial court conducted a thorough inquiry into Juror Wicklund's potential bias and the parties had the opportunity to question him as well. While Juror Wicklund expressed some familiarity with the case from newspaper articles, was aware of the unrelated missing woman case and had discussed opinions about that case with his wife, such knowledge alone does not demonstrate bias which would

-20-

preclude jury service.  "There is no constitutional prohibition in jurors simply knowing the parties involved or having knowledge of the case.  The Constitution does not require ignorant or uninformed jurors; it requires impartial jurors." *McQueen v. Scroggy*, 99 F.3d 1302, 1320 (6th Cir. 1996) (overruled on other grounds by *Abdur'Rahman v. Bell*, 392 F.3d 174 (6th Cir. 2004)).  Juror Wicklund stated that he could be impartial and set aside any preconceived notions about the case, follow the law as instructed by the judge, and base his decision upon the evidence presented at trial.

Although Juror Wicklund initially indicated that it would be difficult to keep the missing woman's case out of his mind, upon further questioning, he unequivocally stated that he could decide the case based solely upon the evidence.  Bias has not been established.  *See Miller v. Francis*, 269 F.3d 609, 616-17 (6th Cir. 2001) (finding that juror was not biased where she said that being fair would be "tough," but never indicated that she would be partial); *cf. Miller v. Webb*, 385 F.3d at 674-75 (finding that juror was biased where she said that "she thought she could be fair" but immediately qualified her statement with a comment expressing partiality).  The trial court found Juror Wicklund to be credible and impartial.  Petitioner has not presented clear and convincing evidence to overcome that factual determination.  Simply put, Petitioner has failed to establish that Juror Wicklund was biased against him or that the trial court erred in denying his challenge for cause.  Habeas relief is not warranted on this claim.

### C.    Denial of Mistrial Claims

Petitioner also asserts that he is entitled to habeas relief because the trial court erred in denying his motion for mistrial.  Petitioner contends that a mistrial was warranted because Dr. Machalka testified about records which were not admitted into evidence and because one of the 14

jurors was not present on the fifth day of trial.  Respondent contends that the first claim is barred by procedural default and the second claim lacks merit.

A trial court has discretion to grant or deny a motion for a mistrial in the absence of a showing of manifest necessity.  *See Arizona v. Washington*, 434 U.S. 497, 506-510 (1978) (mistrial due to deadlocked jury); *Walls v. Konteh*, 490 F.3d 432, 436 (6th Cir. 2007); *Clemmons v. Sowders*, 34 F.3d 352, 354-55 (6th Cir. 1994).  The Supreme Court recently confirmed the significant deference due a trial court's decision to grant or deny a mistrial.  *See Renico*, 130 S. Ct. at 1863–64 (reversing grant of habeas relief on claim contesting state trial court's grant of a mistrial due to a deadlocked jury).

Petitioner first asserts that a mistrial was warranted because Dr. Machalka offered opinions based upon facts and records not in evidence.  Alleged trial court errors in the application of state evidentiary law are not cognizable as grounds for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993).  Thus, to the extent Petitioner asserts that the trial court erred in admitting Dr. Machalka's testimony under the Michigan Rules of Evidence, he merely alleges a violation of state law which does not entitle him to federal habeas relief.  *See Wheeler v. Jones*, 59 F. App'x 23, 28 (6th Cir. 2003).  State courts are the final arbiters of state law and the federal courts will not intervene in such matters.  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002).

That being said, a trial court error in state procedure and/or evidentiary law does not rise to the level of a federal constitutional violation warranting habeas relief unless the error "renders the

proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth

Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *McGuire*, 502 U.S. at

69–70); *see also Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citing *Bey v. Bagley*, 500 F.3d

514, 519-20 (6th Cir. 2007)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

The Michigan Court of Appeals denied relief on this claim, finding that Petitioner did not

contemporaneously object to Dr. Machalka's testimony, but the testimony was nonetheless proper

such that reversal was not required.  As to the merits of the issue, the court explained:

> After reviewing Dr. Machalka's testimony, we conclude that he did not testify to an
> opinion or inference based on facts or data that were not in evidence. Rather, the
> record reflects that Dr. Machalka specifically declined to testify about any
> information or conclusions related to hospital records regarding the victim's
> hospitalization or the victim's regiment of medications that was contained in charts
> that Dr. Machalka did not have with him at trial. Dr. Machalka indicated that when
> he assessed the victim in February and April of 2007, he did not possess the hospital
> records. Thus, his own reports from her appointments with him were not based on
> the hospital records, and he testified at trial only as to what was contained in his
> reports and his recollections and assessments. He indicated that he was only
> testifying with respect to the records that he had with him, and noted that the victim
> was placed on three different medications, but he did not know what other
> medications she was taking because that information was contained in a chart that
> was at his office. The trial court did not abuse its discretion in denying defendant's
> motion for a mistrial because there was no prejudicial irregularity that impaired
> defendant's right to a fair trial. *Lugo, supra* at 704, 542 N.W.2d 921. And, the trial
> court was required to consider less drastic alternatives to remedy any error before
> granting a mistrial. The trial court offered to obtain the other records but defendant
> did not avail himself of this opportunity. *See Gonzales, supra* at 266, 483 N.W.2d
> 458; *Little, supra* at 23, 446 N.W.2d 566. There was no plain error requiring reversal.
> *Carines, supra* at 763–765, 597 N.W.2d 130.

*Pratt*, 2009 WL 1652831 at *4.

The state court's decision is neither contrary to Supreme Court precedent nor an

unreasonable application of federal law or the facts.  Petitioner has not shown that the admission of

Dr. Machalka's testimony denied him due process.  As explained by the Michigan Court of Appeals,

Dr. Machalka testified at trial based upon the records in his possession and his own observations and recollections.  He did not testify about hospital records or attempt to offer opinions about matters outside of his current knowledge.  Petitioner has not shown that Dr. Machalka's testimony was improper under state law or that it rendered his trial fundamentally unfair.  He has thus failed to establish that the trial court erred in denying his mistrial motion or that his constitutional rights were violated by the admission of the Dr. Machalka's testimony.[2]

Petitioner next asserts that a mistrial was warranted because one of the 14 impaneled jurors called in sick and did not appear on the fifth day of trial.  Petitioner claims a violation of his jury trial rights.  It is axiomatic that a criminal defendant has the right to a fair and impartial jury under the Sixth Amendment to the United States Constitution.  *See, e.g., Irwin v. Dowd*, 366 U.S. 717, 722 (1961); U.S. Const. Am. VI.

The Michigan Court of Appeals found that the trial court acted within its discretion and determined that there was no constitutional violation.  The court explained:

> Regarding the missing juror, the record reflects that the trial court dismissed the juror on the morning of the fifth day of trial because she became ill, but the trial court forgot to inform the parties of this development until some evidence was already presented that morning without the parties noticing that there were only 13 jurors instead of 14. Pursuant to MCL 768.18, the trial court
>
>> may order a jury impaneled of not to exceed 14 members.... Should any condition arise during the trial of the cause which in the opinion of the trial court justifies the excusal of any of the jurors so impaneled from further service, he may do so and the trial shall proceed, unless the number of jurors be reduced to less than 12.
>
> This statute "is intended to avoid mistrials in cases where one or more of the original jurors is necessarily discharged during the trial due to personal disability or legal disqualification." *People v. Harvey*, 167 Mich. App. 734, 744, 423 N.W.2d 335

---

[2]Given this determination, the Court need not address the issue of procedural default.

> (1988). The trial court properly exercised its broad discretion in dismissing the juror because of illness, when it empaneled 14 jurors and then reduced it to 13. *Id.* at 745, 423 N.W.2d 335. Defendant failed to establish that he suffered any prejudice to his Sixth Amendment right that deprived him of a fair trial as a result of the juror's dismissal. *Lugo, supra* at 704, 542 N.W.2d 921.

*Pratt*, 2009 WL 1652831 at *5.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. A criminal defendant does not have a federal constitutional right to a 12-person jury, let alone a 12-person jury with two alternates. *See Williams v. Florida*, 399 U.S. 78, 102-03 (1970) (ruling that the Sixth Amendment does not mandate a 12-person jury). Consequently, and as succinctly stated by another judge in this district, "the discretionary decision by a state trial judge to excuse an ailing juror transgresses no 'clearly established Federal Law as determined by the Supreme Court of the United States.' 28 U.S.C. § 2254(d)." *Tate v. Bock*, No. 02-10217-BC, 2006 WL 950369, *5 (E.D. Mich. April 12, 2006) (Lawson, J., denying habeas relief). Petitioner has failed to establish a violation of his Sixth Amendment jury trial rights.

Petitioner also contends that his rights were violated because the trial court excused the ill juror without prior notice to the parties. Petitioner did not raise this specific argument on direct appeal in the state courts. Consequently, the claim is unexhausted. Nonetheless, he is not entitled to relief on any such claim as it lacks merit.

The rights of a defendant to be present and to have the assistance of counsel during all critical stages of trial are fundamental. *See, e.g., Rushen v. Spain*, 464 U.S. 114, 117 (1983). While the complete denial of counsel at a critical stage of the proceedings is a per se Sixth Amendment violation which mandates a presumption of prejudice and is not subject to harmless error review, *see Holloway v. Arkansas*, 435 U.S. 475, 489 (1978) (ruling that reversal is automatic when a

-25-

defendant is denied counsel during a critical stage or throughout the prosecution of a capital offense); *see also United States v. Cronic*, 466 U.S. 648, 659-60 (1984), "violations of these rights are generally 'subject to harmless-error analysis.'"  *Bourne v. Curtin*, 666 F.3d 411, 413 (6th Cir. 2012) (citing *Rushen*, 464 U.S. at 119, n.2).  A partial denial of counsel or the absence of counsel at a non-critical stage of the proceedings is not a structural error.  Rather, such a trial-type error requires an inquiry into the prejudicial effect and/or harmlessness of the error.  *See Satterwhite v. Texas*, 486 U.S. 249, 256-58 (1988); *Rushen*, 464 U.S. at 117-18; *United States v. Wade*, 388 U.S. 218, 239-40 (1967); *Hereford v. Warren*, 536 F.3d 523, 532-33 (6th Cir. 2008); *see also United States v. Owen*, 407 F.3d 222, 227-30 (4th Cir. 2005) (citing cases); *Ellis v. United States*, 313 F.3d 636, 643 (1st Cir. 2002) (stating that per se prejudice applies to a "wholesale denial of counsel," but harmless error analysis applies to a "short-term, localized denial of counsel").  The denial of a defendant's right to be present is also subject to harmless error review.  *See Rushen*, 464 U.S. at 117-18 & n.2; *United States v. Harris*, 9 F.3d 493, 499 (6th Cir. 1993); *see also United States v. Toliver*, 330 F.3d 607, 611 (3rd Cir. 2003) (citing cases).

Petitioner does not argue that he suffered actual harm from the trial court's *ex parte* communication with the extra juror or the court's dismissal of the juror due to illness, and the record reveals none.  Petitioner instead contends that prejudice should be presumed and habeas relief automatically granted.  Petitioner does not cite any United States Supreme Court authority in support of his assertion, but relies upon *United States v. Gay*, 522 F.3d 429 (6th Cir. 1975), and *Hereford v. Warren*, 536 F.3d 523 (6th Cir. 2008).

In *Gay*, the Sixth Circuit held that it was error a district judge speak with members of the jury after it was impaneled and to consider requests for excuses out of the presence of defendant and

without giving notice to defense counsel under Rule 43 of the Federal Rules of Criminal Procedure. The court explained that its holding did "not affect the discretion of the trial court to dismiss a juror and replace him with an alternate, or dismiss an alternate for illness, hardship or other cause. However, even though such dismissals are within the discretion of the trial judge and do not require the consent of the parties, his discretion is always subject to review for abuse, and a record is necessary for such review." *Id.* at 435. Because there was no record or explanation for the dismissals, the court reversed the defendant's convictions and remanded for a new trial.

*Gay* is inapplicable to the case at hand. First, the court based its decision upon the Federal Rules of Criminal Procedure, not federal constitutional law, and the Federal Rules of Criminal Procedure do not govern state criminal trials. Second, the court found that prejudice should be presumed and reversal was required due to the lack of a record for harmless error review. In this case, the record shows that the trial court excused the extra juror due to illness, that it intended to proceed with 13 jurors as allowed under state law, and that nothing the parties could have said would have altered the court's chosen course of action. Such a record is sufficient for review, *see United States v. Dominguez*, 615 F.2d 1093, 1096, n. 5 (5th Cir. 1980) (distinguishing *Gay* where trial court gave explanation for its decision); *United States v. Brown*, 571 F.2d 980, 988-89 (6th Cir. 1978) (finding that trial judge complied with *Gay* by having a hearing to discuss juror's dismissal), and there is no indication that the trial court abused its discretion in dismissing the ill juror or that Petitioner was prejudiced by that decision.

In *Hereford*, the Sixth Circuit ruled that an improper *ex parte* bench conference between the prosecutor, co-defendant's counsel, and trial judge, in which the prosecutor requested that a co-defendant, who had been tried and convicted separately, be given time to speak to his mother,

-27-

did not require automatic reversal or a grant of habeas relief. The court found that the conference was administrative in nature without significant consequences for the defendant such that it was not a critical stage of proceedings. *Hereford*, 536 F.3d at 530. The court further determined that the error in excluding defense counsel from the conference did not have a substantial and injurious effect on the verdict and denied habeas relief. *Id.* at 533. Contrary to Petitioner's assertion, *Hereford* confirms that structural error requiring automatic reversal without a showing of prejudice will only be found in limited circumstances, *i.e.* where the error makes the adversary process "presumptively unreliable." *Id.* at 529 (discussing Supreme Court precedent).

To be sure, in *Rushen*, the Supreme Court held that unrecorded *ex parte* communications between a trial judge and a juror regarding the juror's personal connection to violent crime, which were not disclosed until after the verdict was rendered, were subject to harmless error analysis because the prejudicial effect of the error could be determined in a post-trial hearing. *Rushen*, 464 U.S. at 117-19. Lower federal courts have consistently held that the dismissal of a juror for illness (or other cause) and the *ex parte* communications leading to that dismissal do not violate a criminal defendant's constitutional rights and/or are subject to harmless error review. *See, e.g., Olszewski v. Spencer*, 466 F.3d 47, 64-65 (1st Cir. 2006) (ruling that state court's discharge of juror after ex parte communication with juror's family and doctor did not violate petitioner's right to be present at critical stage of trial and/or that any error was harmless and affirming denial of habeas relief); *United States v. Evans*, 352 F.3d 65, 69-70 (2d Cir. 2003) (any error in excusing ill juror via *ex parte* telephone conversation was harmless); *Williams v. Parke*, 133 F.3d 971, 973-74 (7th Cir. 1997) (concluding that state court's substitution of juror without notice to the parties was harmless error and affirming denial of habeas relief); *United States v. Khoury*, 62 F.3d 1138, 1140 (9th Cir. 1995)

-28-

(district court's dismissal of ill juror without consulting defense counsel was not reversible error where defendant failed to demonstrate prejudice); *Brennan v. Palmer*, No. 2:09-CV-10094, 2011 WL 6206420, *8-9 (E.D. Mich. Dec. 13, 2011) (Borman, J., finding that *ex parte* communication with juror about her continued ability to serve did not constitute reversible error where there was no showing that discussion affected the verdict and denying habeas relief).  Given such authority, this Court finds that any error by the state trial court in dismissing the ill juror and proceeding with 13 jurors without prior notice to the parties is a non-structural error which is subject to harmless error review.

For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 117-18 (2007) (confirming that *Brecht* standard applies in "virtually all" habeas cases); *Ruelas v. Wolfenbarger*, 580 F.3d 403 (6th Cir. 2009) (ruling that *Brecht* is "always the test" in this circuit).  In this case, Petitioner has failed to demonstrate that he suffered any prejudice from the trial court's action in dismissing the extra juror due to illness without giving prior notice to the parties – and this Court can discern none from the record.  In addressing the mistrial motion, the trial judge clearly stated that he dismissed the extra juror due to illness, that he intended to proceed with 13 jurors, and that nothing the parties could have said would have changed his plan. Petitioner does not dispute that the juror was ill or assert that the trial judge abused his discretion under state law, nor does he claim that the remaining jurors or the verdict were adversely affected. He has thus failed to establish that he was prejudiced by any perceived error and/or that the trial court erred in denying his mistrial motion.  Habeas relief is not warranted.

-29-

### D.      Denial of JNOV/New Trial Claims

Petitioner next asserts that he is entitled to habeas relief because the trial court erred in denying his motions for judgment notwithstanding the verdict (JNOV) and for new trial. Petitioner contends that the prosecution failed to present sufficient evidence to support his convictions for interference with electronic communications resulting in injury and unlawful imprisonment. Respondent contends that these claims are barred by procedural default and/or lack merit.

The Federal Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The standard of review for a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "The *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n. 16).

A federal court must view this standard through the framework of 28 U.S.C. § 2254(d). *See Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). Thus, under the AEDPA, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review – the factfinder at trial and the state court on appellate review – as long as those determinations are reasonable. *See Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v.*

-30-

*Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).   Accordingly, "[t]he mere existence of sufficient evidence to convict . . . defeats a petitioner's claim."  *Matthews*, 319 F.3d at 788-89.

Petitioner first asserts that the prosecution failed to present sufficient evidence to support his conviction for interference with electronic communications causing injury or death.  The relevant statute provides:

> A person shall not willfully and maliciously cut, break, disconnect, interrupt, tap, or make any unauthorized connection with any electronic medium of communication, including the internet or a computer, computer program, computer system, or computer network, or a telephone.
>
> * * *
>
> (5) A person who violates this section is guilty of a crime as follows:
>
> * * *
>
> (b) If the incident to be reported results in injury to or the death of any person, the person violating this section is guilty of a felony punishable by imprisonment for not more than 4 years or a fine of not more than $5,000.00, or both.

MICH. COMP. LAWS § 750.540(5)(b).

The Michigan Court of Appeals denied relief on this claim, finding that Petitioner failed to properly support his argument and that the prosecution nonetheless presented sufficient evidence to support Petitioner's conviction.  The court explained in pertinent part:

> The evidence did not preponderate so heavily against the verdict that a miscarriage of justice would result if the verdict is allowed to stand.  *People v. Musser*, 259 Mich. App. 215, 218–219, 673 N.W.2d 800 (2003). The testimony, including defendant's own statement in a telephone call to his mother where he admitted ripping the telephone cord out of the wall, reasonably supported that defendant maliciously prevented or obstructed the victim's attempt to use the telephone to call for help during the course of the increasingly violent domestic dispute, when he threw a chair, came "barreling" at the victim as she ran to the kitchen and picked up the telephone, then ripped the telephone cord out of the wall as she had the telephone in her hand, asked her what she was doing, laughed, and continued his path of destruction by dropping the microwave at her feet. MCL 750.540(4); *see People v. Hotrum*, 244 Mich. App. 189, 193, 624 N.W.2d 469 (2000). Although in the present

-31-

case the victim and defendant presented conflicting testimony, this is insufficient ground for a new trial and the resolution of credibility issues are left to the jury. *People v. Lemmon*, 456 Mich. 625, 642–643, 576 N.W.2d 129 (1998), We further find that based on the same evidence there was sufficient evidence to enable a rational trier of fact to conclude, beyond a reasonable doubt, that defendant interfered with electronic communications resulting in injury. *People v. Wolfe*, 440 Mich. 508, 513–514, 489 N.W.2d 748 (1992), amended 441 Mich. 1201, 489 N.W.2d 748 (1992).

*Pratt*, 2009 WL 1652831 at *5.

The state court's decision is neither contrary to federal law nor an unreasonable application of federal law or the facts. The victim's testimony that Petitioner ripped the home telephone cord from the wall during his physical assault and the evidence of her injuries provided enough evidence to support this conviction. A victim's testimony alone can be constitutionally sufficient to sustain a conviction. *See Tucker v. Palmer*, 541 F.3d 652, 658 (6th Cir. 2008) (citing cases). Petitioner essentially challenges the jury's evaluation of the evidence and the inferences the jury drew from the testimony at trial. However, it is the job of the fact-finder at trial, not a federal habeas court, to resolve evidentiary conflicts. *See Jackson*, 443 U.S. at 326; *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002); *Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."). The jury's verdict and the Michigan Court of Appeals' decision affirming that verdict were reasonable. The evidence at trial, viewed in a light most favorable to the prosecution, established Petitioner's guilt of this offense beyond a reasonable doubt. More importantly, for purposes of federal habeas review, this Court cannot say that the Michigan Court of Appeals' ruling to that effect was unreasonable.

Petitioner also asserts that the prosecution failed to present sufficient evidence to support his unlawful imprisonment conviction. The relevant statute provides:

> (1) A person commits the crime of unlawful imprisonment if he or she knowingly restrains another person under any of the following circumstances:
>
> > (a) The person is restrained by means of a weapon or dangerous instrument.
> >
> > (b) The restrained person was secretly confined.
> >
> > © The person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony.

MICH. COMP. LAWS § 750.349b. Restrain means "to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority. The restraint does not have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts." *Id.*

The Michigan Court of Appeals denied relief on this claim, finding that Petitioner failed to properly brief the issue and that the prosecution presented sufficient evidence to support this conviction. The court explained in part:

> We conclude that the evidence did not preponderate so heavily against the verdict that reversal was warranted. *Musser, supra* at 218–219, 673 N.W.2d 800. When the victim tried to run out of the house, defendant prevented her from leaving by running after her, taking her keys, restraining her by the arm, and blocking the doorway. Defendant then threw the victim's keys out in the yard away from the house, and only then did he grab his own keys, run out of the door, and "flew" out of the driveway as the police were called. Although defendant claimed that he wanted the victim to leave and held the door open, the evidence that he took her keys and restrained her do not support this. Conflicting testimony is not sufficient grounds upon which to grant a new trial. *Lemmon, supra* at 642–643, 576 N.W.2d 129.

*Pratt*, 2009 WL 1652831 at *6.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The victim's testimony that Petitioner forcibly

-33-

kept her from leaving the house during the assault by chasing her, taking and throwing her keys, holding her, and blocking the doorway for a period of time provided sufficient evidence to support this conviction.  A jury could reasonably conclude that Petitioner restrained the victim to further continue his assault and/or flight from the scene.  The jury's verdict was supported by the evidence and the Michigan Court of Appeals' decision affirming that verdict were reasonable.

On direct appeal, Petitioner also claimed that his unlawful conviction is invalid because defense counsel's post-conviction interviews with jury members indicated that they misunderstood the unlawful imprisonment charge.[3]  As discussed *supra*, the Sixth Amendment right to a jury trial guarantees a criminal defendant a fair trial by a panel of impartial jurors.  *See Smith*, 455 U.S. at 217 ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."); *Irvin*, 366 U.S. at 722.

The Michigan Court of Appeals denied relief on this claim, essentially ruling that Petitioner could not impeach the jury's verdict with the information obtained by defense counsel because it concerned matters intrinsic to their deliberations.  The court explained:

> Generally, jurors may not impeach their own verdict by subsequent affidavits showing misconduct in the jury room. As the Court of Appeals has previously noted, once a jury has been polled and discharged, its members may not challenge mistakes or misconduct inherent in the verdict. Rather, oral testimony or affidavits may only be received on extraneous or outside errors, such as undue influence by outside parties. As the United States Supreme Court has explained, the distinction between an external influence and inherent misconduct is not based on the location of the wrong, e.g., distinguished on the basis whether the "irregularity" occurred inside or outside the jury room. Rather, the nature of the allegation determines whether the

---

[3]Petitioner does not appear to raise this specific argument in his habeas petition, but Respondent has addressed the issue.  Accordingly, the Court shall rule on the matter in the interest of completeness.

allegation is intrinsic to the jury's deliberative process or whether it is an outside or extraneous influence. In examining these affidavits, a trial court should not investigate their subjective content, but limit its factual inquiry to determining the extent to which the jurors saw or discussed the extrinsic evidence. [*People v. Budzyn*, 456 Mich. 77, 91, 566 N.W.2d 229 (1997) (citations omitted).]

"Any conduct, even if misguided, that is inherent in the deliberative process is not subject to challenge or review. A jury verdict may be challenged on the basis of juror misconduct only when the verdict is influenced by matters unrelated to the trial proceedings." *People v. Fletcher*, 260 Mich. App. 531, 540–541, 679 N.W.2d 127 (2004).

We hold that the trial court did not abuse its discretion in denying defendant's motion for a new trial. The jury was polled in the present case, and all of the jurors indicated that they agreed with the verdicts rendered. Issues such as those raised here, which are "intrinsic to the jury's deliberative process," are not "extraneous." *See Id.* Thus, even misguided conduct "inherent in the deliberative process" may not be subsequently challenged. *Id*. An allegation that the jury failed to follow the trial court's instructions "relates to the mental processes of the jury and, therefore, inheres in the verdict." *Heintz v. Akbar*, 161 Mich. App. 533, 540–541, 411 N.W.2d 736 (1987). Additionally, we note that the trial court properly instructed the jury on unlawful imprisonment, and defendant raised no objection to the instruction. Jurors are presumed to follow their instructions. *Graves, supra* at 486, 581 N.W.2d 229.

*Pratt*, 2009 WL 1652831 at *6.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. It is well-settled that juror testimony regarding the jury's internal processes and deliberations is inadmissible to impeach the verdict unless extraneous influence is alleged to have affected the jury. *Tanner v. United States*, 483 U.S. 107, 117-18 (1987); *United States v. Rigsby*, 45 F.3d 120, 123 (6th Cir. 1995); *see also* FED. R. EVID. 606(b). In *Tanner*, the Supreme Court explained:

There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process . . . Moreover, a full and frank discussion

in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of lay people would all be undermined by a barrage of postverdict scrutiny of juror conduct.

483 U.S. at 120-21 (internal citations omitted).  Defense counsel's post-verdict interviews about the juror's comprehension of the unlawful imprisonment charge concerned the jury's internal deliberations and matters intrinsic to their decision-making process, not an extraneous or outside influence.  *See, e.g., Williams v. Bagley*, 380 F.3d 932, 945 n.7 (6th Cir. 2004) (noting that internal influences include "the behavior of jurors during deliberations, the jurors' ability to hear and comprehend trial testimony, and the physical and mental incompetence of a juror").  Consequently, that information could not be used to impeach the jury's verdict.  Petitioner has failed to show that the trial court erred in denying his motion for new trial, that the unlawful imprisonment conviction should be overturned, or that his constitutional rights were otherwise violated.

Lastly, to the extent that Petitioner asserts that the verdict was against the great weight of the evidence, he is not entitled to relief.  It is well-established that habeas review is not available to correct errors of state law.  *Estelle*, 502 U.S. at 67-68.  The federal Constitution requires only that the evidence be sufficient to sustain the conviction under the standard established in *Jackson v. Virginia*, 443 U.S. 307 (1979).  Where the evidence is sufficient as a matter of due process, a claim that the verdict was against the weight of the evidence presents a state law issue which is not cognizable on habeas review.  A federal habeas court has no power to grant habeas relief on the ground that a state conviction is against the great weight of the evidence.  *See Cukaj v. Warren*, 305 F. Supp. 2d 789, 796 (E.D. Mich. 2004); *Dell v. Straub*, 194 F. Supp. 2d 629, 648 (E.D. Mich.

2002); *see also Crenshaw v. Renico*, 261 F. Supp. 2d 826, 834 (E.D. Mich. 2003). Habeas relief is not warranted on these claims.[4]

    **E.**    **Sentencing Claim**

Petitioner also asserts that he is entitled to habeas relief because the trial court erred in scoring the state sentencing guidelines by relying upon inaccurate information and by considering facts neither admitted by him nor proven at trial. Respondent contends that this claim is not cognizable on habeas review and lacks merit.

As an initial matter, the Court notes that Petitioner's sentences are within the statutory maximums. *See* MICH. COMP. LAWS § 750.82; 750.540(5)(b); 750.81(2); 750.349b. A sentence within the statutory limits is generally not subject to federal habeas review. *See Townsend v. Burke*, 334 U.S. 736, 741 (1948); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999). Claims which arise out of a state court's sentencing decision are not cognizable upon habeas review unless the petitioner can show that the sentence imposed exceeded the statutory limits or is wholly unauthorized by law. *See Lucey v. Lavigne*, 185 F. Supp 2d 741, 745 (E.D. Mich. 2001). Petitioner makes no such showing.

Moreover, Petitioner cannot prevail on his claim that the trial court erred in scoring the disputed sentencing variables. Such a claim is not cognizable on federal habeas review because it is a state law claim. *See Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003) ("A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only."); *Cheatham v. Hosey*, 12 F.3d 211, 1993 WL 478854, *2 (6th Cir. Nov.19, 1993) (departure from state sentencing guidelines is a state law issue which is not cognizable on federal

---

[4]Given this determination, the Court need not address the issue of procedural default.

habeas review); *see also McPhail v. Renico*, 412 F. Supp. 2d 647, 656 (E.D. Mich. 2006). Any error in scoring the offense variables and determining the guideline range does not merit habeas relief. State courts are the final arbiters of state law and the federal courts will not intervene in such matters. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002). Habeas relief does not lie for perceived state law errors. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Furthermore, even if Petitioner's sentencing guideline claim were cognizable, he would not be entitled to relief. Petitioner has failed to establish that the state court erred in scoring his sentencing guidelines. As explained by the Michigan Court of Appeals on direct appeal, there was sufficient evidence in the record, particularly the victim's testimony, to support the scoring of Offense Variable 3 (physical injury to the victim) at 10 points and Offense Variable 7 (aggravated physical abuse) at 50 points under the guidelines. *See Pratt*, 2009 WL 1652831 at *7-8.

Petitioner attempts to federalize this claim by alleging that the trial court relied upon inaccurate information at sentencing. A sentence may violate federal due process if it is carelessly or deliberately pronounced on an extensive and materially false foundation which the defendant had no opportunity to correct. *See Townsend*, 334 U.S. at 741; *see also United States v. Tucker*, 404 U.S. 443, 447 (1972); *United States v. Sammons*, 918 F.2d 592, 603 (6th Cir. 1990) (defendant must have meaningful opportunity to rebut contested information at sentencing). To prevail on such a claim, a petitioner must show that the trial judge relied on the allegedly false information. *See United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984); *Draughn v Jabe*, 803 F. Supp. 70, 81 (E.D. Mich. 1992). Petitioner has not done so. The record reflects that the state trial court

considered the crime, the pre-sentence report, and other permissible factors at sentencing. Petitioner had an opportunity to contest the accuracy of the sentencing information. Petitioner has not shown that the trial court relied upon materially false or inaccurate information in imposing his sentence which he had no opportunity to correct. Habeas relief is not warranted on such a basis.

Lastly, Petitioner is not entitled to habeas relief on any claim that the trial court improperly relied upon facts neither admitted by him nor proven beyond a reasonable doubt. The Supreme Court cases relevant to this issue, such as *Blakely v. Washington*, 542 U.S. 296 (2004), do not apply to Michigan's intermediate sentencing scheme. The Sixth Circuit has held that Michigan's sentencing guidelines do not violate the Sixth Amendment because they set a minimum sentence range while the maximum is set by statute. *See Montes v. Trombley*, 599 F.3d 490, 494–98 (6th Cir. 2010); *Chontos v. Berghuis*, 585 F.3d 1000 (6th Cir. 2009); *see also People v. Drohan*, 475 Mich. 140, 160–61, 715 N.W.2d 778 (Mich. 2006). This Court is bound by the Sixth Circuit's decisions. Because Petitioner's sentences are within the statutory maximum penalties, which were not enhanced by judicial fact-finding, no Sixth Amendment or due process violation occurred. Habeas relief is not warranted.

## V.   Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on his claims. Accordingly, the Court **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C.

§ 2253(c)(2).  When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).  "A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merits.  *Id*. at 336-37.

Having considered the matter, the Court concludes that Petitioner has not made a substantial showing of the denial of a constitutional rights as to his habeas claims.  Accordingly, the Court **DENIES** a certificate of appealability.  The Court also **DENIES** Petitioner leave to proceed *in forma pauperis* on appeal as an appeal cannot not be taken in good faith.  *See* Fed. R. App. P. 24(a).

**IT IS SO ORDERED**.

Dated:  July 31, 2012

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record and on Christopher Pratt, #673261, Central Michigan Correctional Facility, 320 N. Hubbard, St. Louis, MI 48880 on July 31, 2012, by electronic and/or ordinary mail.

s/Barbara Radke
Deputy Clerk